and Mr. Schulte, whenever you're ready, we'll hear from you. Thank you, Your Honor. Good morning. May it please the Court, my name is Tim Schulte, and I, together with my co-counsel, Sidney Robb, represent Elizabeth Polak in a case against the Department for Environmental Quality. Ms. Polak is suing DEQ under the EPA, claiming that she has been doing or was doing the exactly same job, substantially similar job as Henry Moon, but she was being paid far less. In 2017, her annual pay was $56,325, and in 2019, she was making the same amount, $56,325. That is on page 192 of our joint appendix. While Henry Moon, in 2017, was making $65,800 and in 2019, $69,000. Now, the $69,000 is actually at a time where his work had been reduced by 10%, so if we add 10% to that, he was making $20,000 more than Elizabeth Polak. The district court did not agree with us that the two were doing substantially similar work and dismissed the case on summary judgment. We are here because we think there was error. First, I would like to show the court what these two jobs actually were, and while they are called coastal planners, what they really are doing is they are grant writers. As their supervisor, Laura McCade, explains in her declaration on page 79 of the joint appendix, the National Oceanic and Atmospheric Agency of Federal Branch provides grant funding annually to the state's coastal states, and Virginia is interested in getting as much money of the federal grant as possible. DEQ is the designated agency, and DEQ has opened an office of coastal planners that is basically there to help all state agencies that are involved in trying to get grants with their grants. So if somebody in the city of Virginia Beach says we have beach corrosion, we would like to get some grant money, they call DEQ and say, how do I get some money? And then one of these coastal planners helps them create a grant application, put together the necessary data. They monitor the grants, and when these grants are provided, then the coastal planner monitors further and makes sure that they make timely submissions. If they need extensions, that they're filed on time as such. Mr. Schulte, the district court in this case started out in its opinion by indicating that it's not enough simply to allege that two, in your case, your client and the comparator have essentially the same title, because that's not enough, and you've described what a coastal planner does generally, but the question is, do they actually, in fact, do substantially identical work? And the court identified four differences between what Mr. Moon did and what your client did that suggested that there was a substantial difference. What was wrong with that analysis? Well, first of all, the four duties that the court identifies describe Mr. Moon's duties for one of his clients. He has four clients. VIMS, Virginia Institute of Marine Science, is one of the four. And then these duties were very, very small. For example, in the 18 years that Mr. Moon worked as a coastal planner, apparently he was involved in organizing one summit in 18 years, one conference. That is not a core task, a core duty, as this court has held, is the proper analysis. It's in 18 years, a weekend of a conference, and maybe it took two, three months to plan it, but DEQ neither quantifies the time, nor does it, it just pointed out, here are four things that Ms. Pollack wasn't doing. As we pointed out in the joint appendix, Ms. Pollack had also organized a summit. Organizing a summit as a grant writer, we suggest, requires similar skills and similar tasks. These people do not go out and do active research. They are there to make sure that their customers get the required federal funding. That is their job. And as far as that goes, Ms. Pollack in her declaration said, the needs that VIMS had as a grantee are exactly the same as the needs that my customers had. There is no difference as far as my activities on this job. And so if you go through the record, for example, on page 85, that is the VIMS grant, and again, we assume that is about 25% of what Mr. Moon was doing. He is in charge of grants management and reporting. He monitors activities on assigned grants. He drafts and finalizes grant applications. Page 85 and 86, he manages grants for Northern Neck, Richmond Regional, and Crater. Those are all similarities, and there are a lot of similarities. But Ms. McKay, who was their supervisor, recognized that they had the same title. But she pointed out in her affidavit several tasks that were beyond what Ms. Pollack was doing and might not have been as capable of doing because of lack of experience. I'm looking at paragraphs 18, 19, and 20 of her affidavit. This is on page 82. It seemed to be a fairly disinterested affidavit. She recognizes the value of both employees but then points out that because Mr. Moon had more experience, he worked on more challenging issues related to CZM programs than Pollack and handled more difficult and complex grant application assignments. And then she went out to point out that he had responsibilities with respect to other agencies that Pollack didn't have. And then Moon had responsibility for research projects and conferences that Pollack didn't have. So the question, I suppose, that we're being presented is whether these are disputed, those differences. I understand the similarities, and the similarities you point out are meaningful, obviously, to the discussion. But I think if we're going at differential, we ought to be focusing on what is the differential, is it accurate, and then assessing whether that is substantially equal or virtually identical, which are the two standards we have for interpreting the word equal in the statute. Yes, Judge Niemeyer. The problem with Ms. McKay's declaration is that she's focusing exclusively on the VIMS grant. Her declaration assumes and falsely assumes that Mr. Moon is working on these duties 100% of his time. He's not. He's working on it 25% of his time. He's spending the other 75% on his other accounts. So when she says he's doing these four duties and there's a certain percentage assigned to him. It's not a percentage. She didn't assign percentage. I'm focusing on the notion that he did more complex and more difficult assignments because he had more experience. Now, if you have two persons doing grants, and let's say they're doing nothing else but grants, and one is doing a Level 1 grant and the other is doing Levels 1, 2, and 3 grants in terms of difficulty, then you might want to pay the one who's doing Level 1, 2, and 3 grants more than you pay the person who's only doing Level 1 grants. That's just sort of my hypothetical, and I'm posing that question to you because that, to me, is sort of at the heart of where the district court focused. Yes, sir, but Ms. Pollack in her declaration says, I was working with some Native American tribe, and our challenges were similar to them's. I have done exactly the same work, and this is not – I know that the district court called her declaration unsubstantiated and self-serving, and because of that, completely ignored the declaration. We think that's error, as this court – Except that Ms. Pollack, while being, I'm sure, being genuine and trying to explain in detail her job, is unable to compare that to Mr. Moon's job, who she doesn't know all of what he does and where he does and what assignments he gets. The person who does know both jobs is Ms. McKay, and Ms. McKay gave credit to both employees but did say there was a difference in the level of the work that they did, and that seems to be unrebutted. That's really – that's sort of the heart of the matter here because we're dealing with a statute that says equal pay, and we have interpreted that the comparator under that standard can't be perfectly equal. We recognize that, but it has to be substantially equal or virtually identical, the two jobs, and I think Ms. McKay presents some difficulties in that regard for you, isn't it? Well, Your Honor – I was looking at page 82, sir, where her declaration – I'm sorry? I was – in case you wanted to see where I was looking, it was page 82. I'm trying to find Mr. Moon's work profile to show you the percentages for the duties that Ms. McKay identifies. Let me ask you this. What if for 75% of his job he was doing the same job as Ms. Pollack, but for 25% of his job he was doing a much elevated job? He was doing more advanced policymaking. He was doing different types of conferences, even different types of work. And let's assume that. It's hard to conclude that there being – those two persons have equal value and equal pay. But that is not this case, Your Honor. First of all, Ms. McKay says the one statement on page 82, paragraph 18, he handled more difficult and complex grant application assignments. She doesn't substantiate that. That is just her conclusory statement. And Ms. Pollack denies that and says, I know what he's doing because we talk every day. Mr. Moon and I, we sit in the same office. We coordinate everything we do. We're constantly discussing our workload. And I know exactly what he does and he knows exactly what I do. And so this one statement where she just says he does more than she does, but she doesn't explain how and what and what percentage. Well, she said more complex. More complex and difficult applications. And she says that she assigned that to him, those to him, because he had more experience. That's true. That's a little different from what you were just saying. Well, but it doesn't show why and how these more complex jobs require tasks or skills that Ms. Pollack would not have. Ms. Pollack says in her declaration, I could have done all the tasks. Well, that isn't the task. It's the skills she had. It's the work she was performing. It's equal pay for equal work. And so we have to look at what she actually was doing. So if she was as smart and maybe even smarter than him, but she was giving Level 1 grants and he was getting Level 1, Level 2, Level 3 grants, the work would be different, even though she may have been capable of doing Level 2 and 3. She wasn't doing that work. And so she could go in and say, give me Level 2 and Level 3 and then pay me comparably. But I think the question here is what she was actually doing, isn't it? And, sir, if we had that kind of specificity in the record, my position would be more difficult, but we don't. We do not have anything. DEQ has no records that say that Mr. Moon's grants were Level 2 or Level 3 or Level 4. There's nothing. All we have is these four words there. It is more complex. And Ms. Pollack says, no, they're not. I know what he was working on, and we were doing exactly the same work and working to the same standards. The district court also comes up with hypothetical, what if a grant and basically follows, not follows your example, but has a similar example saying, what if a customer is more stringent or more difficult than another customer? None of that was in the record. And under a summary judgment, we get inferences. DEQ does not get these inferences. And what the district court put together ignores all of our evidence and makes inferences out of thin air that were not anywhere in the record. All we have is this one statement in paragraph 18 of Ms. McKay's where you have 19 and 22. But they're not, if you look at his records, the National Estuarine Research Reserve Systems, these are minute percentages of his workload. They're 3% of one-fourth of his work. The core responsibility that he and Ms. Pollack had was helping people get grant money. And that was, and these grantees had the same needs as Ms. Pollack's needs. Mr. Shultz, can I ask a question about the evidence in the record? So it doesn't appear that we have evidence specifically about Mr. Pollack's grants. Other than the, I mean, we don't have the sample grants, for example. We have descriptions of what they do. And so your client says, as you point out, that I know what he's doing. He does the exact same thing. We talk about it all the time. But why isn't the evidence of the sample grants that Pollack is working on in the record? And if it's not in the record, does that hurt or help you? Well, I think it helps me. First of all, there are about 70,000 documents in this case that were produced by DEQ. When DEQ filed its motion for summary judgment, they did not attach any grants. And we didn't find it necessary to attach any to our summary judgment memoranda. So I don't think they brought that up as a topic. What we're relying on is basically the job descriptions. And there, too, they have very little because until the day of summary judgment, DEQ had taken the position, Mr. Moon is not our employee. And so they have very, very few employment records of his. They have income-related, tax-related stuff. But they don't really have an EWP, as they do from Mr. Pollack, for example. They don't have these documents for him. Okay. I have one final question for you that I know is not necessarily relevant to the appeal here today. But isn't a legitimate distinction between your client and Mr. Pollack just the numerical difference in years of experience? And if so, when does that become relevant? Sir, under MIA, that would be relevant when we come to the affirmative defense. It's not part of the comparison of whether they have equal work. I see my time is long enough. I would like to reserve the last minute. Well, it's been an interesting discussion. We have you back on rebuttal. Thank you, sir. All right. Mr. Mews. Good morning, Your Honors. My name is Brian Mews, and I represent the Virginia Department of Environmental Quality, or DEQ as it's normally referred to. Your Honors, the district court did not err in granting summary judgment to DEQ in this case. Contrary to Ms. Pollack's framing of the issue as the district court creating some new or grand pronouncement that the EPA is not available to white-collar employees or that the evidence was ignored, the district court's decision simply follows summary judgment standards in Celotex and the Liberty Lobby case. The issue of proving that there was a male comparator to Ms. Pollack who performed substantially equal, not substantially similar, similar in the context of a Title VII case, but substantially equal work, which has been defined by this court in Spencer and Wheatley and other cases as virtually identical, that is Ms. Pollack's burden. The court did not say that in no situation where you have coastal planners working with different tasks, different stakeholders, could you ever have an EPA claim. What the court held was that the plaintiff in this case failed to satisfy her burden of demonstrating that evidence. Your Honor, just briefly, since obviously the facts are certainly in the record, DEQ does wish to respond here initially to the statement that on the eve of summary judgment, somehow there was a change in how it recognized Mr. Moon's position. That is not the case. Mr. Moon was hired through the Virginia Institute of Marine Science, which is part of the College of William & Mary. They obtained him as a coastal planner. With respect to his employment status with DEQ, all DEQ has recognized that for purposes of summary judgment and undisputed facts, that there's not undisputed facts that demonstrate that he was not a joint employee. So DEQ has not, during this litigation, changed his position, just merely recognized what the status is for summary judgment. With respect to that, Mr. Moon was hired by VIMS, Virginia Institute of Marine Science, which is a sub-recipient of these grants that are provided by NOAA, the National Oceanic and Atmospheric Administration, to coastal states. And there's other sub-recipients as well. So DEQ administers these, and there's a variety of other sub-recipients, including VIMS. But ultimately, as stated, plaintiff Ms. Pollack failed to carry her burden, because what she was relying on was attempting to create a comparator at a high level of abstraction versus actually going, as Wheatley says, factor by factor. What is not contested is, in fact, admitted in response to, for example, in response to DEQ's statement of an undisputed fact, paragraph 24, Ms. Pollack admitted that Moon was solely responsible for four of the VIMS grant deliverables that accounted for approximately a third, somewhere between 32.5% and 37.5% of the budget and the grant, but also Moon's time, how he spent his time. And that was not disputed. Again, Your Honor. So, I mean, they don't have to be virtually identical, right? There can be some differences. Do you think that that standing alone is enough to warrant a grant of summary judgment? Your Honor, respectfully, I would disagree that it doesn't have to be virtually identical. In the Spencer case, this Court defined substantially equal as being virtually identical. So one difference in a job description is enough to kick a plaintiff out of court? Your Honor, I would grant the Court that certainly one job description if it wasn't significant, because again— That's what I'm asking. Is this significant? And if so, why is it? Well, this goes towards, for example, in Wheatley and Spencer, where they discuss how the manner of the work can be similar, whereas the actual duties have to be equal. And whether one duty, if it was minor, certainly, if a duty was minor, certainly, I think the District Court recognized that, saying, again, there's no broad pronouncement concerning, oh, coastal planners could never be substantially equal. But here, it is not just one difference. It is conceded for the record that a third or over a third of Moon's duties and the time he spent with respect to his grants for the VIMS grant was different. And DEQ would certainly argue, Your Honors, that that is for Equal Pay Act purposes, perhaps unlike Title VII purposes, but for Equal Pay Act purposes is significant enough to prevent a plaintiff from establishing a prima facie case. Mr. Schulte says that that's just one grant and that you take that in isolation. That shouldn't be the sine qua non of whether or not these parties are on equal footing when it comes to their job descriptions. Yes, sir. But again, I think Ms. Pollack's argument in some ways turns the burden here on its head. Much of the argument is, well, DEQ didn't do this. DEQ didn't do this. What DEQ did was demonstrate that four of the duties, approximately a third of his time, were different. Ms. Pollack responded by saying, well, we're coastal planners. We both do, as her counsel said today, we both do coastal planning work. We do grant funding work. So I'm sorry to interrupt you, but the duties might be different, but if they're qualitatively the same, wouldn't that, I mean, it seems like that's what she's arguing. Yeah, we did different things. We had different grants. But the core function was qualitatively the same. Your Honor, I think that also gets to the heart of the Spencer case, where, in that case, the plaintiff argued our duties are qualitatively the same. We're both professors. We have responsibility for teaching college students. This is sort of the Spencer versus Virginia thing, teaching classes, preparing syllabi. We are governed under the same standards. And certainly, as the court in Spencer recognized, those were similar, qualitatively similar. But respectfully, Your Honor, if I'm disagreeing with you, we would posit that. It wouldn't be the first time, but go ahead. Thank you, Your Honor. We would posit that positively, or excuse me, that substantially similar is not virtually identical or virtually equal. And again, this court did not ignore Ms. Pollack's evidence or refuse to consider it. The court considered Ms. Pollack's evidence, including her declaration. And as noted on brief, the court also did not, in a wholesale way, conclude, the court's just not going to even acknowledge this declaration. In terms of statements that the declaration was self-serving, that related only to portions of the declaration concerning essentially conclusions of law, saying, well, our jobs are substantially equal. We did virtually the same thing, which is a legal conclusion that, of course, has to be underpined by the facts in the case, whether that demonstrates it or not. But the undisputed material facts related to these differences, Ms. Pollack's statement related to differences, Ms. Pollack characterized them as differences based on experience. But the reality is, regardless of the reason, there was no question that there were differences in what they did. Ms. Pollack, in fact. You were relying on the VIMS grant, which was a substantial part of his time. Was that grant different from other grants on which, say, Ms. Pollack worked on? Your Honor, there certainly were differences in these grants. And I think that's set in the record. For example, Mr. Pollack's work collaborating with the Chesapeake Bay Sentinel Site Cooperative, preparing and handling marsh vulnerability studies. Your Honor, I think that gets to the point, is that DEQ offered specific evidence in terms of these differences, and that it wasn't rebutted, and, in fact, it was admitted in many cases. In fact, this Court can only look to Ms. Pollack's own statements. In many ways, she summed this up best when she admitted that she had no responsibilities with respect to the VIMS grant, in the same way that Mr. Moon had no responsibilities with respect to her clients. For example, the Virginia Department of Conservation and Recreation. Okay, so let's say that the record is limited to that. He works on Grant A. She works on Grant B. She claims that they're qualitatively similar in the sense of the extent of the work that's to be done. So is it simply a subjective decision by the employer that I think this work is more valued than that? Well, Your Honor, at the prima facie case stage, I think certainly in terms of the value, that could go towards an affirmative defense in terms of the reasons for a salary differential. But here, it is not an issue of a subjective case of whether a certain work was more valuable than the other. What DEQ relied on and what we contend the district court relied on was the fact that they were different, certainly from an EPA substantially identical standpoint, that the work is different. Well, to follow up a little bit on this question, was work being done on the VIMS grant different in kind than the work being done by, say, Ms. Pollack on another grant? In other words, was it the same work or was it different work? I'm not sure that it gets you very far just to have a different benefactor, a name. It's like having a different customer in a business. The question is, if you're serving customer A and the work is more complex and different than the work you serve for customer B, that seems to be a valid point to make. But if you're serving customer A and customer B with the same type of services and one worker is doing A and one worker is doing B, that may not help much. Your Honor, I think certainly, and I think this gets to the issue of Spencer. Before you get to Spencer, I understand Spencer. I want to know what the record shows about the nature of the VIMS grant as distinct from other grants. Well, the record, and I would point to Ms. McKay's declaration and testimony, does show that these were different. For example, in her deposition, which is in the record, I apologize, I don't have a page, but in her declaration, which is also on brief, she was asked, well, didn't Ms. Pollack also do these same duties on Section 309 of the grant? And she responded no. She didn't have the same qualifications and based on his years of experience, for example, to do coastal, excuse me, with respect to coastal impact work, whereas it may have been in the same grant, but she was doing land conservation work. And Ms. McKay offered testimony where there was no facts to rebut it, no evidence to rebut it, that this was different work and required more skill. And, Your Honors, I think this difference with respect to jobs like these, and I mentioned Spencer, and Your Honor, I apologize, I wasn't trying to avoid answering the question. No, no, I understand Spencer, and your answer is, if I understand it correctly, is that doing coastal management is a different task and perhaps more difficult than doing conservation on land, which is also under the grant. And that's what I understand your point being. Yes, Your Honor. That answers my question, yes. And her burden, once these facts are presented, to rebut that. Yeah, the prime case has the requirement that she make that as part of her showing. And DEQ does believe that this case does need, there's many cases cited between the two briefs, that it does need to be taken in light of the nature of the work. And that's where I mentioned Spencer is starting to answer a moment ago, that these types of cases, these types of jobs that require a high degree of intellectual creativity, whether it's academic, this is science in nature, although certainly Mr. Moon's job was through William & Mary, which is part of VIMS, but whether it's science or academic, that what Spencer holds is that those jobs in particular really need to be addressed and viewed on this very factor-by-factor level, because it is something where the creative process and the specific nature of the work and the sophistication of the work is perhaps different than, for example, many of the cases cited by Ms. Pollack. You know, it's notable that while there's a voluminous number of cases cited in her briefing, many of these cases, perhaps virtually all the cases, relate to, for example, individuals performing work where the Hodgkin versus Fairmont Supply Company, where somebody was saying, well, my job working the middle of a section of a stock desk is different than the two women who are working on the outside of the stock desk. Unlike this case, many of those cases also involve what we would refer to as the more work case. In other words, where as opposed to saying, well, these are different types of work, in terms of, for example, unlike two college professors that are both college professors, but are doing different types of work, cases, for example, where you have the Brennan versus Prince William Hospital case, which Plaintiff cites, which is a case where in 1972 the hospital had a policy where it only hired male orderlies and only hired female nurses aides. But somewhat remarkably, that wasn't actually the issue of the case, that we had this sex-specific job hiring criteria, but it was an allegation that, well, because male orderlies maybe had more duties with respect to restraining patients, that that is, you know, that that's insufficient. Doing the same thing and just a little more of it is different than what was at issue in Spencer and what was at issue in here. And the court held, again, much like Spencer, that many of these allegations of similarities, grant writing, for example, strategic planning. The case rests on the notion, at least in addressing Pollack's affidavit, the notion that all grants aren't the same just as all professors are not the same, that some grants are more difficult to handle than others, and it's more complex, maybe larger in sums and so forth. Is that how I understand? Yes, Your Honor. It absolutely is. And if Ms. Pollack wishes to demonstrate that the jobs were similar, that the actual grant work was not similar, excuse me, but substantially equal, virtually identical, that is her burden, and that is what the court found that she failed to do, instead choosing to rely on viewing the jobs at more of this high level of abstraction. Well, we're all grant planners. We all do strategic planning. We all work for clients related to things like coastal planning. Coastal planning matters. This is simply insufficient under the Equal Pay Act for her to carry her burden to establish a prima facie case. Your Honor, for these reasons, DEQ would request that this court affirm the judgment of the district court granting summary judgment to DEQ based on a failure by Ms. Pollack to establish a viable male comparator. Thank you, Mr. Mews. Mr. Costello. Excuse me, Mr. Schulte. Mr. Costello is in our last case, and the two of you are quite distinct. Apology accepted, Your Honor. I would like to very quickly go back to Ms. McKay's declaration on page 82. In paragraph 18, she says, Mr. Moon handled more difficult and complex grant applications. In 19, she talks about responsibilities for the National Estuary and Research Reserve System, NAERS. If the court looks at page 86, which is the VIMS grant that financed Mr. Moon's position, it shows the duty regarding NAERS. It is on page 87, product number 12. It is assigned a 5% value of the VIMS grant, not of his entire time, of just the work for VIMS. So if that's one-fourth, that's a 1% part of his work. I'll try to share with you what my concern is and let you try to address it head on. In Spencer, which is a pretty good precedent for us to apply here, because here we have two coastal planners and there we had two professors, and if you describe a professor's job, two professors are basically doing the same thing. But not all professors are the same in experience, quality, evaluation. And we made that point, and it seems to me, if it turns out that the VIMS grant and some other grants are more difficult and complex than grants handled by Ms. Pollack, that's a full professor versus an assistant professor who's less experienced. In other words, I'm not focusing on the title, they could be both full professors. But the question is, are we looking at the same job, the same work? And the people well placed to evaluate whether they're doing the same jobs are the people that supervise them. And in this case, we don't need two different supervisors to compare notes. We have one supervisor who's new of both their works and said there is a difference, a material difference. And now the question is, if there is a material difference, how does Ms. Pollack challenge that? And you can challenge it as a matter of law like you are, you're saying 5% is not enough or 10%, but that isn't the issue. The question is that the standard we've used is either substantially equal or virtually identical. And clearly if we have 35% of his work is on the VIMS, and that's a difficult and important grant, which does coastal environmental work as distinguished from what Ms. McKay said is less difficult, that is land-based environmental work, there's a difference right there. Now, I don't know if we have to make a judgment about that difference, but the people that hired her thought it was different. And the question is, are they being reasonable or is that just a sham? Is that a pretense where she's saying that they're different work? And as you see, the problem we're having is it's a tough standard, and the question is, I suppose, what makes coastal workers, planners, same and what makes them different? Your Honor, this court in Spencer said professors are not widgets. The physics professor cannot teach sociology class. We're just trying to point out that they're not fungible. One professor is not the same as another. These two people are fungible. Well, Ms. McKay said not so. Hampton Roads, the Hampton Roads project, one huge customer was moved from Mr. Moon to Ms. Pollack, and there were no difficulties with that. Ms. Neumeier is correct here. Ms. McKay said they're not fungible. She said Ms. Pollack doesn't do and can't do coastal hazard management in the way that Mr. Moon can, and there's other differences in what they do. We have in the record the amount of the grant, the amount of money that Mr. Moon was managing. I did not find any evidence in the record about how much Ms. Pollack is managing. If anything, there's a lack of evidence for us to make this comparison, and that falls on you. Your Honor, I don't think there's a lack of evidence. If you look at the VIMS documents, the differences are based on duties that take up a minute amount of time of Mr. Moon's work. This is not his core task. How do we know that? I'm sorry? How do we know that? Because on page 87, it says, Coastal Partners Workshop, 5%, 5% of the VIMS grant. Program representation about the National Estuarine Research Reserve in Virginia is product number 12, 5%. Those are the two main differences Ms. McKay rests on. They are together 10% of a 25% account. That's of the grant. But he worked on the entire grant. He spent a third of his time on that grant. Well, we don't know about a third of the time. I thought it was 30% to 38% or something of his time on the VIMS grant. That's not the VIMS grant. There are certain aspects of the VIMS grant. That is where DEQ delineates certain duties. And that's 37% of the VIMS grant. Again, that's 8% of his work. I know my time is long up. I'm interested in hearing if you have a point to make. I'll give you one more minute to wind up. Thank you, sir. Spencer is limited to the university system. We have listed, I don't know how many, 24 cases about fraud investigators, female nurse practitioners, anesthesiologists, university fundraisers, librarians, newspaper photographers, directors of sales, bank managers, vice presidents for medical research centers. These are highly intellectually challenging jobs. It is not that the EPA is shut closed for white collar workers. We ask that the court vacate the order and send this case to trial. Thank you very much. Thank you, Mr. Schulte. All right. I want to thank counsel for their arguments on behalf of the court. We normally come down. You know, I don't know if you know the history of this, but back in the 1930s, Judge Parker came back after his defeat for the Supreme Court position. He says he's going to really give his attention to the Fourth Circuit. And he created the judicial conference, and he created the notion that district judges newly appointed sit with the court so we get to know each other. And he created the handshake, which we come down and shake hands with the court and the bar. And it's a wonderful tradition, and I think we're all set on keeping it. I think we're the only court that does that, and we don't give it up lightly. But as you know, the pandemic has caused some changes. But this is our virtual handshakes to you, and thanks for your arguments. So we'll adjourn court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Albert Diaz, Allison J. Rushing